**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0295n.06

No. 08-2624

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**May 13, 2010**

LEONARD GREEN, Clerk

LOUIS STRAMAGLIA, MILL CONTRACTORS )
AND DEVELOPERS, INC., MELTON ROAD )
DEVELOPMENT CO., )
                                          )
      Plaintiffs, )
                                            )
VOLPE-VITO, INC., )
                                            )
      Plaintiff-Appellant, )
                                            )
v. ) On Appeal from the United States
                                            ) District Court for the Eastern
UNITED STATES OF AMERICA, ) District of Michigan
                                            )
      Defendant-Appellee. )

Before:      BOGGS and COOK, Circuit Judges; and COLLIER, Chief District Judge.[*]

      PER CURIAM. Volpe-Vito, Inc. appeals the district court's order granting summary judgment in favor of the United States of America on the issue of whether, under Michigan law, Volpe-Vito is a mere continuation of Auburn Park Management Co. Because we conclude that the district court did not err, and because we find no genuine issues of material fact, we affirm the judgment of the district court.

---

[*]The Honorable Curtis L. Collier, Chief Judge of the United States District Court for the Eastern District of Tennessee, sitting by designation.

**I**

Volpe-Vito, Inc. (Volpe-Vito), a Michigan corporation, was founded in October 1981. In 1982, Louis Stramaglia (Stramaglia) and his brother Frank acquired sole ownership of the corporation.

Volpe-Vito's business involved the development of a water park on the corporation's real estate in Shelby Township, Michigan. Volpe-Vito began operating the park, known as Four Bears Water Park (Four Bears), in 1983. Volpe-Vito continued to operate the park, which was open seasonally, until 1992.

In 1992, at the behest of Volpe-Vito's creditors and attorneys, the Stramaglias decided to form a separate management company to operate Four Bears. The express reason for forming this new company was to separate the water park's operating liabilities from Volpe-Vito's assets (*i.e.*, the land and facilities). Stramaglia's sister Nancy formed the new corporation, named Auburn Park Management Company (Auburn Park), in March 1992.

Shortly after its formation, Auburn Park entered into a lease agreement with Volpe-Vito, which granted Auburn Park the right to operate Four Bears. Auburn Park entered into new lease agreements with Volpe-Vito in 1993 and 1996, the latter of which is at issue in this case. Under the terms of these contracts, Auburn Park agreed to pay Volpe-Vito an annual rental fee of $200,000 and ten percent of gross sales. Auburn Park also agreed to pay all real estate taxes and assessments that became due on Volpe-Vito's property. The agreements would automatically renew annually unless either party gave notice of cancellation due to breach.

Auburn Park managed Four Bears for nine years. During that time, Stramaglia gradually assumed sole ownership and control over both Auburn Park and Volpe-Vito. By 1997, Stramaglia was the sole shareholder, director, and president of both Auburn Park and Volpe-Vito. The only other officer was Thomas Nepa (Nepa), who served as secretary and accountant for both Volpe-Vito and Auburn Park. It was Stramaglia, however, who, in his capacity as Auburn Park's president, managed the daily business activities of Four Bears.

Both before and after Stramaglia became president, Auburn Park apparently repeatedly neglected to satisfy its employment tax obligations. According to the Internal Revenue Service (IRS), between 1996 and 2002, Auburn Park accrued over $270,000 in unpaid employment tax obligations. In October 2001, the IRS filed Notices of Federal Tax Liens against Auburn Park for over $300,000 in back taxes.

Shortly thereafter, on November 29, 2001, Stramaglia, acting as sole shareholder and director of Volpe-Vito, passed a resolution terminating the lease agreement between Volpe-Vito and Auburn Park. The resolution noted that Auburn Park had failed to pay Volpe-Vito's real estate taxes in 2000 and 2001, and that such failure constituted a breach of the lease agreement. Auburn Park made no apparent effort to contest or resist termination.

Pursuant to the November 29 resolution, the lease agreement between Auburn Park and Volpe-Vito ended on December 31, 2001. At that time, the right to operate Four Bears reverted to Volpe-Vito. This left Auburn Park with three remaining assets. First, Auburn Park held equipment and machinery with a book value of $14,228. Stramaglia offered to surrender this equipment and machinery to the IRS, but the IRS apparently declined the offer. Thereafter, the equipment and

machinery were placed on Volpe-Vito's books, in return for which Volpe-Vito reduced Auburn Park's debt to Volpe-Vito by $14,228. Second, Auburn Park held investment accounts of unknown value. These accounts were transferred to Volpe-Vito's books. Finally, Auburn Park possessed accounts receivable with a book value of over $300,000, representing debts owed to Auburn Park by Flab, Inc.[1] Auburn Park continued to carry these receivables on its books, but eventually forgave them as uncollectible.

Once Stramaglia cancelled the lease agreement between Volpe-Vito and Auburn Park, Volpe-Vito resumed operating Four Bears. Volpe-Vito apparently did not make any significant changes to the operations of Four Bears. Rather, Stramaglia, acting as Volpe-Vito's president, continued to manage Four Bears much as he had before. Volpe-Vito operated Four bears until 2004, at which time the park permanently closed.

In 2006, the IRS filed tax liens against Volpe-Vito, Stramaglia, and two other related entities, asserting that they were liable for the unpaid tax liabilities of Auburn Park. Stramaglia, Volpe-Vito, and the related entities filed a complaint in the United States District Court for the Eastern District of Michigan seeking a judgment declaring that they were not liable for Auburn Park's debts. Volpe-Vito and the government both filed motions seeking summary judgment on the issue of Volpe-Vito's liability as successor to Auburn Park. The district court granted summary judgment in favor of the government on the grounds that, under Michigan law, Auburn Park was a mere continuation of Volpe-Vito. Volpe-Vito timely appealed.

---

[1]Flab, Inc. was another corporation owned by Stramaglia's family and, by 1992, run by Stramaglia. Flab operated Honey Bear Restaurant, the on-site restaurant of Four Bears.

## II

On appeal, Volpe-Vito asserts that the district court erred when it applied the "mere continuation" exception. This court reviews a district court's order granting summary judgment *de novo*, but reviews its findings of fact for clear error. *Keck v. Graham Hotel Sys.*, 566 F.3d 634, 636 (6th Cir. 2009). Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment "bears the initial burden of identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389-90 (6th Cir. 2008) (citing *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)). Once the moving party has satisfied its burden, the nonmoving party "may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009). The "mere existence of a scintilla of evidence" will not prevent summary judgment, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986), and if the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249-50 (citations omitted).

In this case, the district court did not err when it found Volpe-Vito liable as Auburn Park's successor. Michigan follows the "traditional rule of nonliability for corporate successors who acquire a predecessor through the purchase of assets." *Foster v. Cone-Blanchard Mach. Co.*, 597

N.W. 2d 506, 509 (Mich. 1999). However, Michigan recognizes five narrow exceptions to the traditional rule of non-liability:

> (1) where there is an express or implied assumption of liability; (2) where the transaction amounts to a consolidation or merger; (3) where the transaction was fraudulent; (4) where some elements of a purchase in good faith were lacking, or where the transfer was without consideration and the creditors of the transferor were not provided for; or (5) where the transferee corporation was a mere continuation or reincarnation of the old corporation.

*Id.* at 509-10 (quoting *Turner v. Bituminous Casualty Co.*, 244 N.W.2d 873, 878 n.3 (Mich. 1976)). It is the fifth exception–the so-called "mere continuation" exception–that is at issue in the present case.

The Michigan Supreme Court has recognized the "mere continuation" exception since the turn of the twentieth century. *See Chase v. Mich. Tel. Co.*, 80 N.W. 717, 718 (Mich. 1899) (citing *Austin v. Tecumseh Natl. Bank*, 68 N.W. 628 (Neb. 1896)). The court has indicated that the exception rests on two related principles. *See Pearce v. Schneider*, 217 N.W. 761 (Mich. 1928) (imposing liability on a corporation because it was a "reincarnation" of its predecessor). First, "courts will not tolerate any species of transaction where the stockholders in the debtor corporation are permitted, by virtue of their stock ownership, to retain for themselves an interest in the corporate assets until the debts of the corporation shall have been paid." *Id.* at 762 (quoting 15 A.L.R. 1112). Second, a "corporation which acquires the entire property of another corporation under an arrangement which has the effect of distributing the assets of the latter corporation among its stockholders, to the exclusion of its creditors, takes the property subject to payment of the debts of its vendor." *Ibid.* (quoting *Grenell v. Detroit Gas Co.*, 70 N.W. 413, 413-14 (Mich. 1897)).

To determine whether a successor corporation is a mere continuation of its predecessor, Michigan courts examine the totality of the circumstances and engage in a multi-factor analysis. *See, e.g.*, *id.* at 762; *Shue & Voeks, Inc. v. Amenity Design & Mfg., Inc.*, 511 N.W.2d 700, 702 (Mich. App. 1993); *Ferguson v. Glaze*, No. 268586, 2008 WL 314544, at *5 (Mich. App. Feb. 5, 2008). The only indispensable prerequisites to application of the exception appear to be common ownership and a transfer of substantially all assets.[2] *See, e.g.*, *Pearce*, 217 N.W. at 762; *Shue & Voeks, Inc.*, 511 N.W.2d at 702; *Gougeon Bros. v. Phoenix Resins, Inc.*, No. 211738, 2000 WL 33534582, at *2 (Mich. App. Feb. 8, 2000). Beside these two factors, the most important consideration appears to be the nature of the business performed by the successor corporation–that is, whether its "main corporate purpose was to conduct the same business" as its predecessor. *Pearce*, 217 N.W. at 762; *see also Shue & Voeks, Inc.*, 511 N.W.2d at 702; *Ferguson*, 2008 WL 314544, at *2. Several other factors also bear upon "mere continuation" analysis: the new corporation's retention of the old corporation's officers and employees, *see Shue & Voeks, Inc.*, 511 N.W.2d at 702; *Ferguson*, 2008 WL 314544, at *5; the new corporation's occupancy of the old corporation's place of business; *see Gougeon Bros.*, 2000 WL 33534582, at *2; and the new corporation's selective repayment of the old corporation's debts, *see ibid.*

Volpe-Vito asserts that a court must also find evidence of inadequate consideration or fraud to impose liability under the "mere continuation" exception. We recognize that several jurisdictions do require the presence of one or both of these factors. *See, e.g.*, *Kazir's Floor & Home Design, Inc.*

---

[2]Notably, however, no Michigan court has found these factors alone sufficient to justify imposition of successor liability.

*v. M-MLS.com*, 394 F.3d 1143, 1150 (9th Cir. 2004) (discussing California law). Michigan, however, is not such a jurisdiction. *See Shue & Voeks, Inc.*, 511 N.W.2d at 702 (finding the Uniform Fraudulent Conveyance Act inapplicable based on the adequacy of consideration and absence of fraud, but failing to mention either the absence of fraud or adequacy of consideration as part of "mere continuation" analysis).

Applying the factors examined by Michigan courts to the present case, Volpe-Vito was a mere continuation of Auburn Park. First, Volpe-Vito acquired substantially all of Auburn Park's assets. This included not only all of Auburn Park's physical assets[3]–which were relatively meager–but also, more importantly, Auburn Park's most valuable asset: the right to operate Four Bears.[4] *Cf., e.g.*, *Warne Invs., Ltd. v. Higgins*, 195 P.3d 645, 651 (Ariz. App. 2008) (imposing liability based on the transfer of intangible assets); *Gladstone v. Stuart Cinemas, Inc.*, 878 A.2d 214, 225 (Vt. 2005) (basing liability on the transfer of "the critical asset [of] accessibility to films for public viewing"). Stramaglia effectively transferred that right from Auburn Park to Volpe-Vito when, in his capacity as sole shareholder and director of Volpe-Vito, he cancelled the lease agreement between Volpe-Vito and Auburn Park. Ordinarily, of course, cancellation of a lease agreement would not constitute an asset transfer. In this case, however, Stramaglia had sole control over both Auburn Park's performance of its obligations under the lease agreement and Volpe-Vito's

---

[3]Volpe-Vito suggests that Auburn Park actually abandoned this property. Yet Volpe-Vito's actions belie this characterization of Auburn Park's conduct, as Volpe-Vito sought to compensate Auburn Park for the assets by forgiving part of Auburn Park's debt.

[4]Stramaglia acknowledged in his deposition testimony that Auburn Park's assets included the right to operate Four Bears, embodied by the lease agreement.

response to default. Moreover, Stramaglia controlled Auburn Park's response to cancellation–that is, whether Auburn Park fought to preserve its primary revenue-producing asset, or simply accepted the loss (as it did). As a result, Stramaglia essentially had discretion to shift the right to operate Four Bears between Auburn Park and Volpe-Vito. Under these circumstances, cancellation of the lease agreement resembled more a voluntary transfer than an involuntary termination of rights.

Appellant contends, however, that Auburn Park's most valuable asset was actually the $300,000 in accounts receivable that remained on Auburn Park's books. *See* Appellant's Brief at 18. Yet the district court found that these receivables were eventually forgiven as uncollectible, and appellant does not contest that finding. Further, Auburn Park's accountant, Nepa, admitted that the company had no assets after it transferred its physical property to Volpe-Vito. The evidence in the record thus indicates that Volpe-Vito did acquire substantially all of Auburn Park's assets.

Second, as appellant concedes, Auburn Park and Volpe-Vito shared common ownership, as Stramaglia was the sole shareholder in both corporations.

Third, after Volpe-Vito acquired Auburn Park's assets, it conducted exactly the same business at the same location as Auburn Park–it operated Four Bears.[5] Appellant seeks to distinguish Volpe-Vito's business on the grounds that Volpe-Vito operated the park using its own property and equipment. Yet appellant offers no explanation of how ownership of the underlying assets altered the nature of the business conducted. Both Auburn Park and Volpe-Vito focused entirely on

---

[5]According to Stramaglia's testimony, before resuming control over Four Bears, Volpe-Vito was merely a shell that held the property and facilities operated by Auburn Park, but that conducted no business and had no employees of its own.

operating the same facilities; the latter's ownership of those facilities had no apparent impact upon the nature of its business activities.

Fourth, Volpe-Vito retained the same managers as Auburn Park. Stramaglia served as president and sole director of both companies, with primary responsibility for the affairs of Four Bears, and Nepa served as both corporations' secretary and accountant.

Finally, though their employees were not identical, there were substantial similarities between Auburn Park's and Volpe-Vito's workforces.[6]

Additionally, the considerations that led Michigan to embrace the "mere consideration" exception support its application in the present case. By transferring Auburn Park's assets to Volpe-Vito, Stramaglia sought to derive benefits from the same assets (including the right to operate Four Bears) that served as Auburn Park's primary source of revenue, while leaving Auburn Park's creditors without recourse. This is precisely the type of behavior that the Michigan Supreme Court sought to control when it adopted the "mere continuation" exception. *See Pearce*, 217 N.W. at 762.

Accordingly, under Michigan law, Volpe-Vito is a mere continuation of Auburn Park. The district court thus did not err when it granted summary judgment in favor of appellee.

**III**

For the aforementioned reasons, we affirm the judgment of the district court.

---

[6]Unsurprisingly, given the seasonal nature of the water park's business, many employees changed between seasons. Notably, however, the categories and number of positions that existed under Volpe-Vito's control was essentially the same as existed under Auburn Park's control. Moreover, there was significant overlap between the life guards and office workers employed by the two corporations, the positions that presumably required the most training and thus exhibited the most stability.