NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0853n.06

No. 12-2619

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Sep 30, 2013
DEBORAH S. HUNT, Clerk

C.T. CHARLTON & ASSOCIATES, INC.,

      Plaintiff-Appellant,

v.

THULE, INC.,

      Defendant-Appellee.

)
)
)
)
)
)
)
)

On Appeal from the United States
District Court for the Eastern
District of Michigan

Before:     BOGGS and DONALD, Circuit Judges; and STAMP, District Judge.[*]

BOGGS, Circuit Judge. C.T. Charlton & Associates (CTC) provided sales-representation services to TracRac, a manufacturer of truck-mounted racks. As TracRac fell into financial difficulty, it stopped regularly paying CTC's commissions. In 2010, Thule, Inc., purchased the assets of TracRac, which dissolved shortly thereafter. CTC now seeks to recover its unpaid commissions from Thule, under theories of successor liability and unjust enrichment. Because Thule purchased CTC's assets in an arms-length, cash transaction, Thule was not unjustly enriched and the traditional rule against successor liability applies. We affirm the decision of the district court.

**I**

---

[*]The Honorable Frederick Pfarr Stamp, Jr., United States District Judge for the Northern District of West Virginia, sitting by designation.

In 2004, CTC entered into a contract with TracRac to provide sales representation services in Michigan, in exchange for a commission on all sales. Under the terms of the contract, commissions would be due even after its termination, "on orders, inquires received, or programs developed" under CTC's tenure. TracRac terminated the contract in 2007 and continued to pay commissions on previously developed sales for the next three years. Nevertheless, due to financial difficulties, TracRac only made its payments intermittently, ultimately accumulating approximately $150,000 in debt from unpaid commissions.

Facing potential bankruptcy, TracRac had its broker approach Thule, a large manufacturer of automotive and sporting-goods accessories, about acquiring the TracRac business. After a few months of negotiations, Thule agreed to purchase substantially all of TracRac's assets for over $3 million, effective October 29, 2010. To avoid assumption of TracRac's liabilities, the transaction was structured as an asset sale for cash. Thule assumed only a minimal amount of TracRac's liabilities, and the asset-purchase agreement expressly excluded "accrued commissions earned by [TracRac's] sales representatives" and "waive[d] and release[d] [Thule] from any liability for commissions claimed by Charlton & Associates, Inc." After the acquisition, Thule continued to manufacture and market TracRac products under the TracRac brand name, and business operations remained largely continuous. The acquisition was publicly announced and Thule sent letters to TracRac's suppliers, retailers, and sales representatives to explain the transition. Within three months of the purchase, the TracRac shell corporation had wound down its liabilities and dissolved.

On August 10, 2011, CTC brought this diversity case against Thule, alleging successor liability for TracRac's failure to pay commissions and unjust enrichment, among other claims. On

November 13, 2012, the district court granted Thule's motion for summary judgment. In rejecting successor liability, the district court found it significant that the express terms of the asset-purchase agreement between TracRac and Thule disclaimed assumption of the CTC commissions and also that CTC failed to bring suit against TracRac when it had the chance. The district court rejected the unjust-enrichment claim as well, finding that CTC provided no benefit to Thule and that the existence of the express contract between CTC and TracRac precluded the court from implying a contract with Thule. CTC appeals.

## II

This court reviews de novo a district court's grant of summary judgment. *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 346 (6th Cir. 2012). Summary judgment is appropriate where the record shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view all of the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 670 (6th Cir. 2013).

CTC argues that successor liability should be imposed upon Thule for debts incurred by TracRac prior to the acquisition, as Thule purchased TracRac as a going concern and continued to operate it as before. As will be explained below, CTC relies on the wrong legal standard and cannot meet the more stringent test required under Michigan law.

Michigan follows the traditional rule of successor liability, under which the successor in a merger ordinarily assumes all of its predecessor's liabilities, but a purchaser of assets for cash does not. *Foster v. Cone-Blanchard Mach. Co.*, 597 N.W.2d 506, 509 (Mich. 1999). With respect to

asset purchases, this general rule is subject to five narrow exceptions: 1) express or implied assumption of liability; 2) de facto consolidation or merger; 3) fraud; 4) transfer lacking good faith or consideration; and 5) "mere continuation or reincarnation of the old corporation." *Id.* at 509  10. In *Turner v. Bituminous Cas. Co.*, 244 N.W.2d 873 (Mich. 1976), the Michigan Supreme Court expanded the scope of successor liability in the products-liability context, establishing the "continuity of the enterprise" doctrine. *Turner*, 244 N.W.2d at 883.  Under this doctrine, successor liability is imposed if 1) there is continuity of management, personnel, location, assets, and operations; 2) the predecessor promptly ceases business operations; and 3) the purchaser assumes those liabilities necessary for continuity in business operations. *See Foster*, 597 N.W.2d at 510 (describing *Turner* doctrine). *Turner* also deemed relevant whether the purchasing corporation holds itself out to the world as the "effective continuation" of the predecessor. *Ibid.* CTC argues that this broader standard applies across the board; Thule argues that it is limited to the products-liability context.

Before answering the question of whether the "continuity of the enterprise" doctrine applies in the context of a commercial contract, an analytical ambiguity should be cleared up. Both parties, and the district court, suggest that the "mere continuation" exception and the "continuity of the enterprise" doctrine are one and the same. *See* Appellant Br. at 19; Appellee Br. at 15; Dist. Ct. Op. at 6 n.2. There is some Michigan case law in support of this position. *RDM Holdings, LTD v. Continental Plastics Co.*, 762 N.W.2d 529, 552 (Mich. Ct. App. 2008) ("As indicated earlier in this opinion, the continuing enterprise theory (mere continuation or reincarnation of the old corporation) is the only theory that can be pursued by plaintiffs at trial.") A review of *Turner*, however, suggests

that these are best understood as two independent exceptions, motivated by different policy concerns and applied in different circumstances. In creating the "continuity of the enterprise" doctrine, *Turner* modified one of the traditional "limited exceptions" to successor liability to fit in the products-liability context. But this modified exception was not the "mere continuation" exception, which is only mentioned in passing in *Turner*, appearing in a list in a footnote. *Turner*, 244 N.W.2d at 877 n.3. Instead, *Turner* modified the de-facto-merger doctrine, a traditional exception that imposes successor liability when four requirements are met: 1) continuation of the enterprise, 2) continuity of shareholders, 3) ending of ordinary business operations by the seller, and 4) assumption of liabilities and obligations necessary for uninterrupted continuation of business operations by the purchaser. *Turner*, 244 N.W.2d at 879. After reviewing the policies underlying products-liability law, the court concluded that, in the products-liability context, the form of the acquisition is irrelevant to the question of liability. *Id.* at 880 ("[L]ogically and teleologically, there is no basis for treating a purchase of corporate assets different from a de facto merger."). As a result, the *Turner* court dropped the "continuity of shareholders" element, requiring only elements 1, 3, and 4 of the de-facto-merger doctrine to establish successor products liability. *Id.* at 883. The "continuity of the enterprise" doctrine, therefore, is best read as a relaxation of the de-facto-merger doctrine in products-liability cases, not a redefinition of the "mere continuation" exception. The "mere continuation" exception remains narrow, but retains its general applicability.

No matter how the "continuity of the enterprise" doctrine is characterized, a review of Michigan law and the policies underlying the doctrine makes clear that it is only meant to apply in products-liability cases (and potentially a few other areas animated by similar public-policy

concerns[1]). In creating the doctrine, *Turner* emphasized that "[t]his is a products liability case first and foremost." *Turner*, 244 N.W.2d at 877. This was no hollow distinction, but the primary grounds for departing from traditional corporate-law doctrines. Because the traditional doctrines of successor liability "developed to protect the rights of creditors and minority shareholders," the Michigan Supreme Court reasoned that such doctrines are "not applicable to meeting the substantially different problems associated with products liability torts." *Id*. at 878; *see also Foster*, 597 N.W.2d at 510 ("The traditional rule reflects the general policy of the corporate contractual world that liabilities adhere to and follow the corporate entity. . . . In the context of tort law, the traditional rule with its narrow exceptions has been criticized as an elevation of form over substance . . . ."). Thus, while *Turner* may have "shake[n] off various impediments associated with traditional concepts" for products-liability cases, those impediments remain in force elsewhere. *Turner*, 244 N.W.2d at 416; *see also id.* at 423 ("This is precisely the result when the problem is correctly treated as a products liability case and is decided on products liability principles rather than simply by reexamining and adjusting corporate law principles.").

---

[1] In *Stevens v. McLouth Steel Prods. Corp.*, 446 N.W.2d 95 (1989), for example, the Michigan Supreme Court held that a successor corporation could be held liable for employment-discrimination claims, as long as the successor had notice of the claims. The *Stevens* court relied on the Sixth Circuit's reasoning that the civil-rights laws "mandate" application of successor liability, as failure to impose liability could "emasculate" the power of courts "to eradicate the present and future effects of past discrimination." *Id.* at 98 99 (quoting *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086 (6th Cir. 1974)). *See also John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 550 (1964) (holding that duty to arbitrate survives change of ownership, since "a collective bargaining agreement is not an ordinary contract."). Michigan has only expanded liability for certain statutory causes of action; it has not relaxed the traditional rule with respect to ordinary common-law torts. *See Chase v. Mich. Tele. Co.*, 80 N.W. 717, 718 19 (1899); *Denolf v. Frank L. Jursik Co.*, 221 N.W.2d 458, 461 (Mich Ct. App. 1974), *modified on other grounds*, 238 N.W.2d 1 (Mich. 1976).

Subsequent case law has affirmed this limitation. In tracing the development of the doctrine, *Foster* explained that tort-policy concerns "shaped this Court's expansion of the traditional rule." 597 N.W.2d at 510. In *Craig ex rel. Craig v. Oakwood Hosp.*, 684 N.W.2d 296 (Mich. 2004), the Michigan Supreme Court declined to extend successor liability in the medical-malpractice context, reasoning "[n]ot only are the *Turner/Foster* requirements not met here but, more important, the policies that justify the imposition of successor liability are noticeably inapplicable here." *Id.* at 315. Likewise, *Starks v. Mich. Welding Specialists, Inc.*, 722 N.W.2d 888, 889 (Mich. 2006), reaffirmed the traditional rule of successor non-liability for asset purchases, rejecting expansion of the *Turner* doctrine "[b]ecause an exception designed to protect injured victims of defective products rests upon policy reasons not applicable to a judgment creditor." *Id.* at 889. Our circuit as well has rejected application of *Turner* in other contexts; in an environmental-liability case, we broadly concluded that "the Michigan Supreme Court intended that the continuing enterprise exception be limited to products liability cases." *City Mgmt. Corp. v. U.S. Chem. Co.*, 43 F.3d 244, 252 53 (6th Cir. 1994).

In its reply brief, CTC attempts to distinguish *Starks* and *Craig*, arguing that they intentionally declined to limit *Turner* solely to products-liability cases and the proper inquiry is determining "whether the circumstances of that case implicate the policy concerns that shaped the court's limitation of the traditional rule in the first place." (Reply Br. at 6.) Although *Starks* and *Craig* plainly demonstrate a reluctance to expand the reach of *Turner*, CTC is correct that the ultimate question is whether *Turner*-type policies apply in the given context. CTC has not shown, however, why the policy considerations that led *Turner* to expand the scope of successor liability are

applicable to the general commercial context (or how non-judgment creditors like CTC are distinguishable from judgment creditors like those in *Starks*).

One of the key principles underlying products-liability law is that "'the hazards of predicting and insuring for risk from defective products are better borne by the manufacturer than by the consumer.'" *Turner*, 244 N.W.2d at 881 (quoting *Cyr v. B. Offen & Co.*, 501 F.2d 1145, 1154 (1st Cir. 1974)). This principle encourages looking past the formality of the corporate entity to the substance of the business: if there is a continuity of the business enterprise, the new entity is equally able to predict and insure against risks. Commercial contracts, however, are not governed by the same one-sided risk allocation   both sides are expected to negotiate the allocation of risk and receive the benefit of the bargain. *Cf. Sullivan Indus., Inc. v. Double Seal Glass Co.*, 480 N.W.2d 623, 629 (Mich. Ct. App. 1991) ("[T]ort law is concerned with 'the accident problem,' and, consequently, seeks to protect against harms to other property and persons by allocating the risk of dangerous or unsafe products to the manufacturer rather than to the consumer. In contrast, commercial law is concerned with economic expectations. Commercial enterprises allocate the risk of loss due to nonperformance among themselves . . . .") (internal citations omitted). CTC does not press this point, but instead focuses on the other main policy: "to provide a remedy to an injured plaintiff in those cases in which the first corporation 'legally and/or practically becomes defunct.'" *Foster*, 597 N.W.2d at 511.

To start, because the public-safety concerns that underlie tort law are absent in the commercial context, the force of this policy is weakened. But reliance on this policy is problematic for a more fundamental reason. Injuries from defective products are likely to occur long after the

predecessor corporation has become defunct. Unpaid debts and breached contracts, by contrast, will typically be actionable at the time of the sale of assets. Only the rare case would invoke the need-for-a-remedy policy (e.g., undiscovered fraud in an expired contract), and no such circumstances are present here. In this case, TracRac received over $3 million in an arms-length transaction and subsequently wound down its business. CTC has provided no explanation for why the TracRac shell would not have been a valid target for recourse — no bankruptcy was filed, and we have no evidence as to TracRac's net asset-liability position after the purchase. Nor has CTC explained how its ignorance of the purchase negotiations prevented it from acting once the acquisition became public knowledge. As *Foster* holds, even in products-liability cases, a plaintiff cannot recover from a successor corporation where the "predecessor remains a viable source for recourse."[2] *Ibid*. The traditional exceptions, "developed to protect the rights of creditors," are more appropriate in this case than *Turner*'s tort-centric expansion. *Turner*, 244 N.W.2d at 878.

The cases CTC cites do not suggest otherwise. Most stand for the uncontroversial proposition that the traditional exceptions to successor liability (specifically "mere continuity") apply in the commercial context. Under the "mere continuity" exception, courts will look to the totality of the circumstances — but only if the "indispensable" requirements of common ownership and a transfer of substantially all assets are met first. *See Stramaglia v. United States*, 377 F. App'x 472,

---

[2]"Viable source for recourse" is not the same thing as solvent. Creditors have recourse (i.e., a right to recovery) against insolvent companies, even though they may ultimately get pennies on the dollar or nothing. Tort victims do not have recourse against solvent predecessor corporations if the predecessor dissolved years before injury. *See, e.g.*, *Turner*, 244 N.W.2d at 875–876 (defective press was purchased in 1968; predecessor corporation dissolved and distributed assets to its shareholders in 1964).

475 (6th Cir. 2010). In practice, the "mere continuity" exception is a cousin of piercing the corporate

veil, and thus targeted at limiting abuse of the corporate form, unlike the "continuity of the

enterprise" doctrine, which instead imposes liability for policy reasons. *See, e.g.*, *RDM Holdings*,

762 N.W.2d at 552 ("Much of the evidence discussed above in relation to the corporate veil claim

is equally relevant to the successor liability claim.") Thus, in nearly every case cited by CTC, there

was common ownership between the predecessor and successor corporation. *Stramaglia*, 377 F.

App'x at 473 ("By 1997, Stramaglia was the sole shareholder, director, and president of both Auburn

Park and Volpe-Vito."); *Steinberg v. Young*, No. 09-11836, 2010 WL 1286606, at *2 (E.D. Mich.

Mar. 31, 2010) ("Mr. Steinberg alleges that Mr. Young has abused the corporate form of the SDE

Entities, and that Mr. Young has been fraudulently transferring assets out of the SDE Entities in an

effort to defeat Mr. Steinberg's collection efforts."); *RDM Holdings*, 762 N.W.2d at 551 (Mich. Ct.

App. 2008) ("Here, there was documentary evidence that Con-Plastics, a 49 percent owner of Con-

Lighting, and its president, Anthony Catenacci, fully controlled every aspect of the operations at

Con-Lighting, including the decision to cease operations and file for bankruptcy to the detriment of

numerous creditors."); *Lakeview Commons LP v. Empower Yourself, LLC*, 802 N.W.2d 712, 716

(Mich. Ct. App. 2010) ("Phyllis owned 80 percent and Troy owned 20 percent of both Empower and

Hamsa.").

The only case not involving common ownership, *Antiphon, Inc. v. LEP Transport, Inc.*, 454

N.W.2d 222 (Mich. Ct. App. 1990), does not help CTC. *Antiphon* did not apply the "mere

continuity" exception, but instead applied the "implied acceptance of liability" exception under an

estoppel theory. *Id.* at 225. In the case, the creditors of the predecessor corporation were not notified

of the dissolution, and the successor corporation continued to hold itself out as its predecessor. *Id.*

at 224. Under these facts, the court held that the successor corporation was estopped from

disclaiming its predecessor's liabilities. Although CTC intimates that this deal between TracRac and

Thule was done in secret, it does not allege that it was unaware of the dissolution or believed that

Thule had assumed TracRac's liabilities, and, in any case, does not invoke this exception.

Lacking commonality of ownership or suggestions of fraud, this case does not fit within the

narrow exceptions to the traditional rule against successor liability. Even CTC's invocation of the

broader products-liability standard falls flat: CTC was fully able to bring its claims against TracRac

while TracRac was winding down, and has provided no reason why Thule should pay for CTC's

oversight in failing to prosecute such claims. *See Foster*, 597 N.W.2d at 511.

## III

CTC also asserts unjust-enrichment and quantum-meruit claims against Thule.[3] To establish

a claim of unjust enrichment, the plaintiff must show 1) "receipt of a benefit by the defendant from

the plaintiff" and 2) that "it is inequitable that the defendant retain" the benefit. *Dumas v. Auto Club

Ins. Ass'n*, 473 N.W.2d 652, 663 (Mich. 1991). When these elements are met, "the law operates to

---

[3]CTC has pled separate "unjust enrichment" and "quantum meruit" claims (although not because they have different elements, *see Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d 898, 904 (Mich. Ct. App. 2006)). Count IV (unjust enrichment) alleges that Thule benefitted from CTC's efforts and has failed to pay for those benefits, both in unpaid and future commissions. (R.1, Compl. at 12.) Count VIII (quantum meruit) appears to be targeted at TracRac, holding Thule liable as its successor. Due to lack of successor liability, this claim fails. In addition, given the express contract between TracRac and CTC, it is not clear what "implied contract" CTC seeks to recover on the basis of. As a result, we will only address Count IV in this section.

imply a contract in order to prevent unjust enrichment." *Barber v. SMH (US), Inc.*, 509 N.W.2d 791, 796 (Mich. Ct. App. 1993). CTC fails to meet either element.

First, although Thule has received a benefit (contracts acquired with the help of CTC's services), the benefit was purchased from TracRac, not provided by CTC.[4] This first element will not be met where the third party, through its own actions, acquires the benefit of the unpaid-for contract. *See Arlington Transit Mix, Inc. v. MGA Homes, Inc.*, No. 2008 002714 CH, 2012 WL 2402124, at *3 (Mich. Ct. App. June 26, 2012) (rejecting unjust-enrichment claim against mortgage lender, which foreclosed upon and took possession of property that had been improved with unpaid-for construction materials). Simply because an asset continues to provide value does not mean that the original provider of the asset continues to provide a benefit. Under CTC's theory, purchasers would never be able to acquire unencumbered assets from failing companies without facing unjust-enrichment claims in the event of default.

Second, CTC has not shown that Thule received its benefit unjustly. Although under Michigan law the existence of an express contract between two parties does not automatically preclude recovery from a third party under an unjust-enrichment theory, *Morris Pumps*, 729 N.W.2d at 904, the existence of such a contract is relevant to the determination of whether the enrichment was unjust or inequitable, *ibid.* In particular, "[w]here a third person benefits from a contract entered into between two other persons, in the absence of some misleading act by the third person, the mere

---

[4]The nature of this benefit is contested. The district court considered only the completed sales on which TracRac did not pay commissions, finding no evidence that CTC was entitled to commissions on future sales made after date of the acquisition. Dist. Ct. Op. at 7.

failure of performance by one of the contracting parties does not give rise to a right of restitution against the third person." *Ibid.* (quoting 66 Am. Jur. 2d *Restitution and Implied Contracts* § 32). Here, the key fact is that Thule paid TracRac for its assets: where a benefit has been fully paid for, its receipt cannot be unjust. CTC was able to pursue its ordinary contract remedies against the newly liquid TracRac, both for the unpaid commissions and the expectation value of future commissions. Unjust enrichment is not meant to apply to such a situation, and CTC's claim fails.

**IV**

For the foregoing reasons, the decision of the district court granting summary judgment to Thule is AFFIRMED.