RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0031p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

HELENA AGRI-ENTERPRISES, LLC,

*Plaintiff-Appellant*,

*v.*

GREAT LAKES GRAIN, LLC, et al.,

*Defendants*,

NEW HEIGHTS FARM I, LLC; NEW HEIGHTS FARM II, LLC; STACY BOERSEN, NICHOLAS BOERSEN,

*Defendants-Appellees*.

No. 20-1671

---

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:18-cv-00963—Robert J. Jonker, Chief District Judge.

Argued: January 29, 2021

Decided and Filed: February 10, 2021

Before: SUTTON, BUSH, and MURPHY, Circuit Judges.

---

## COUNSEL

**ARGUED:** Zach Zurek, JACKSON WALKER L.L.P., San Antonio, Texas, for Appellant. Ronald J. VanderVeen, CUNNINGHAM DALMAN, PC, Holland, Michigan, for Appellees. **ON BRIEF:** Zach Zurek, Robert L. Soza, Jr., JACKSON WALKER L.L.P., San Antonio, Texas, Mark J. Magyar, DYKEMA GOSSETT PLLC, Grand Rapids, Michigan, for Appellant. Ronald J. VanderVeen, CUNNINGHAM DALMAN, PC, Holland, Michigan, for Appellees.

_____

**OPINION**

_____

SUTTON, Circuit Judge.   Through several corporations, members of the Boersen family have planted corn and soybeans in Western Michigan for several generations.   When 2016 delivered a poor crop year, the corporate entities that made up the Boersen operation could not cover their debts.   One creditor, Helena Agri-Enterprises, obtained a nearly fifteen-million-dollar judgment against the Boersen entities and the family members who ran them.   When they could not pay that debt, Helena sued other Boersen family members and their newly formed companies, claiming that these new corporate forms should not be respected and were fraudulently designed to sidestep the debt.   Because Helena has failed to offer a legitimate explanation for slighting the corporate form, we affirm the district court's grant of summary judgment to the defendants.

I.

Arlan and Sandra Boersen are third-generation farmers and took over the family business in 1987.   They are the parents of Dennis and Ross Boersen.   The brothers, together with their parents, have run the Boersen farming enterprise together for some time.   Dennis Boersen and his wife, Stacy Boersen, have one son, Nicholas Boersen.   Although the mother and son have helped out with the operation in the past, neither one of them had an ownership stake or held a management position in the entities that controlled the operation.

Family owned though it may have been, the Boersen operation was not a modest Amish farm.   At its height, the Boersens farmed about 100,000 acres in Zeeland, a rural community in Western Michigan.   The Boersen operation owned about 20,000 of those acres.   Leased farmland covered the rest.   The operation rotated corn and soybean on the owned and leased land.

The Boersens took a path followed by many farmers.   They grew.   But expansions of farms sometimes create problems of their own.   Twin realities of modern farming are that "those who could not get big have got out," and those "who got big to stay in are now being driven out by those who got bigger."   Wendell Berry, *The Unsettling of America: Culture and Agriculture*

41 (1977). To manage the operation, the Boersens created several corporations, including Boersen Farms, Inc., Boersen Farms Properties, LLC, and Boersen Farms AG, LLC, among others. Some were owned and operated by the parents and brothers together. Others were owned by Dennis alone.

Large-scale farming, and for that matter, small-scale farming, comes with economic complications and fated uncertainties. The complications arise from the yearly imperative of up-front costs and back-end revenue. Farming has become "a way of dependence, not on land and creatures and neighbors but on machines and fuel and chemicals of all sorts, *bought* things, and on the sellers of bought things—which made it finally a dependence on credit." Wendell Berry, *Jayber Crow* 183 (2001). Every spring, as before as after, the farmer buys seeds, repairs farm equipment, leases or purchases equipment, sometimes leases land, often buys fertilizers and pesticides. Each cost amounts to a tribute to hope, an anticipation that crops will emerge and that a reasonable market for the goods will exist. The cost-revenue gap usually requires loans or purchases on credit, especially for large-scale, sometimes highly leveraged, operations like the Boersen farms. Even the community gardener knows the uncertainties that come with farming each year: too little rain or too much, too little sun or too much, late frosts, ravenous insects, trespassing rodents. These unpredictable pestilences require crop insurance, which helps to manage the cycle of broken promises that comes with farming. In modern times and with large-scale farms, a large regulatory regime has arisen to handle the pricing and terms of this insurance, often pegged to the Actual Production History of that farmland.

Things did not go well for the Boersen farming operation in 2016. The combination of a poor crop and tumbling crop prices led the Boersen operation to fall behind on its financial obligations. Lenders and suppliers soon came after the Boersen entities and family members for unpaid debts.

One unpaid creditor was Helena Agri-Enterprises, LLC, an agricultural distributor that sells seed, fertilizer, and chemicals. It sold quite a bit of these products on credit to some Boersen family members and several of the Boersen companies. The Boersen entities were not able to pay Helena what they owed it.

In 2018, Helena sued Dennis, his parents, and various Boersen entities in federal court. For some of Helena's claims, the defendants consented to a partial judgment on the pleadings for nearly $15,000,000. Stacy (Dennis's wife) and Nick (Dennis's son) were not parties to the case, and they were not owners or officers in the relevant corporations. While Helena's lawsuit was pending, Stacy created several "Great Lakes Grain" entities—Great Lakes Grain I, II, III, and IV—in an effort to obtain credit for the upcoming season. That did not work.

Without credit, the Boersen operation closed down because it could no longer "obtain financing," and "without financing" it "could not conduct farming operations." R.140-13 at 4. Instead of seeking bankruptcy relief, the companies made arrangements with creditors. Various creditors repossessed most of the Boersen farmland. The rest of their land was subject to mortgage and judgment debts that "exceed[ed] the value of the real property." *Id.* at 5. Similar arrangements were made with respect to the Boersens' farming equipment. Secured creditors repossessed most, but not all, of the operation's equipment assets. All told, the Boersen operation avoided bankruptcy but did not have the means to continue farming for a few years.

As the 2019 season approached, Nick Boersen approached his mom Stacy Boersen about a "business opportunity." R.148-1 at 14. He proposed that they farm some of the same land that the Boersen entities had once plowed. Stacy agreed to "partner with [Nick] and move forward [together]." R.148-3 at 4.

Stacy formed New Heights Farm I, LLC, and Nick formed New Heights Farm II, LLC. Each of them is the sole record owner of their respective company. And each company is "separate and independent of the Boersen legacy [entities]." R.140-16 at 3.

Stacy and Nick relied on the farmland's production history to secure funding. They used the credit to lease land and equipment. Some of their leases were from Boersen-judgment defendants (Dennis, Ross, their parents, and several corporations); some were not.

When Helena learned of the New Heights companies, it added them as well as Stacy and Nick to the 2018 lawsuit as defendants. Although none of the new defendants owed Helena money, Helena alleged that Stacy and Nick created "sham" companies to evade the $15,000,000 judgment against the Boersen operation. R.75 at 1. Helena filed state law claims against these

new defendants premised on Michigan's Uniform Voidable Transactions Act, successor liability, and veil piercing. The district court granted summary judgment in favor of the new defendants on each claim.

## II.

*The Uniform Voidable Transactions Act.* The Act permits a creditor to void a fraudulent asset transfer from a debtor. Mich. Comp. Laws § 566.37(1)(a). The Act defines a debtor as "a person that is liable on a claim." *Id.* § 566.31(f). It defines a covered asset as "property of a debtor." *Id.* § 566.31(b). And it defines a covered transfer to mean "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset." *Id.* § 566.31(q). Taken together, the provisions of the Act mean that a creditor may void the fraudulent disposal of property belonging to a person who is liable on a claim. *See Swirple v. MGM Grand Detroit, LLC*, No. 345284, 2020 WL 561904, at *2–3 (Mich. Ct. App. Feb. 4, 2020) (per curiam). A transfer of assets can be fraudulent when evidence shows the transferor intended to commit fraud or the economic realities of the transaction confirm that fraud was afoot. *Id.*; *see also* Mich. Comp. Laws §§ 566.34(1)(a), 566.35(1).

From where Helena sits, three fraudulent asset transfers occurred under the Act. Each deserves a turn.

1. *Equipment and Land Leases.* Helena claims that several equipment and land leases by Stacy and Nick (and their companies) should be voided. Stacy and Nick leased equipment from Boersen Farms & Affiliates, LLC, an entity not subject to the Boersen judgment. And they leased land from Ceres, a third party not subject to the Boersen judgment.

This theory does not work because the statute applies only to "transfer[s] made or obligation[s] incurred by a debtor." Mich. Comp. Laws §§ 566.34, 566.35. Nothing in the statute suggests that arrangements between non-debtors come within its sweep. The statute instead presumes that "the transferor must actually be liable for the claim." *Mather Invs., LLC v. Larson*, 720 N.W.2d 575, 578 (Mich. Ct. App. 2006). Helena acknowledges that it does not seek to void any transfer involving a Boersen-judgment debtor. Appellant's Br. 25–27.

That concession, when combined with the language of the statute, puts Helena's claim in a difficult place.

Even so, Helena points out, Dennis Boersen will benefit from the equipment lease arrangement because he owns Boersen Farms & Affiliates, LLC, the non-debtor entity leasing equipment to Stacy and Nick. But that does not eliminate the problem. The reality that a debtor benefits from the lease arrangement does not expose non-debtors to liability under the statute. These benefits may even help Helena in the long run. Nothing prevents Helena, for example, from going after Dennis's proceeds from the arrangement. None of this shows fraud anyway. So far as the record shows, the leases all adhered to fair market prices.

Helena argues in the alternative that we should treat the lease arrangements as transfers involving Dennis Boersen, a judgment debtor, because he qualifies as an "[i]nsider" of the New Heights companies under the statute. Mich. Comp. Laws § 566.31(h). But the purpose of the "insider" provision is to determine whether a transfer involving a debtor is fraudulent, not to determine whether a transfer involves a debtor in the first place. *Id.* § 566.34(2)(a). Helena at any rate has no response to the unchallenged reality that the leases do not transfer the debtors' assets because none of the involved entities owes any money to Helena. The statute voids "transfer[s] . . . incurred by a debtor." *Id.* § 566.34(1). It does not void transfers by non-debtors.

2. *Actual Production History*. Noting that the New Heights companies' crop insurance application used production history from land owned by the Boersen companies, Helena argues that this fact establishes a fraudulent transfer. We disagree, though the disagreement requires some background and elaboration.

Recall that Stacy and Nick and their companies, like many farming operations, needed up-front funding to start their operation. To get funding, they needed crop insurance, which covers losses in crop yields resulting from unexpected damage. Benefits under a crop insurance plan depend in part on production history, a record of the prior crop yield that insurance underwriters use to determine premiums and financing terms.

Recall also that Stacy and Nick's operations took place on Boersen farmland. In his crop insurance application, Nick used the production history of Boersen Farms AG, LLC, an entity indebted to Helena. In her crop insurance application, Stacy relied on the production history of Boersen Farms Grain, an entity not indebted to Helena.

The problem with Helena's argument is that Stacy and Nick's use of the family farm's production history does not constitute a "transfer of assets" under the statute. An "[a]sset," the statute says, must be "property of a debtor," Mich. Comp. Laws § 566.31(b), and property includes "anything that may be the subject of ownership," *see id.* § 566.31(l). Ownership turns on the possession of legal title. *See Franklin v. Franklin*, No. 289255, 2010 WL 2178550, at *3 (Mich. Ct. App. June 1, 2010) (per curiam); *All. Bancorp v. Select Mortg., L.L.C.*, No. 274853, 2008 WL 724092, at *2 (Mich. Ct. App. Mar. 18, 2008) (per curiam).

People do not own crop production histories any more than they own facts or history itself. *Cf. Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 344 (1991) (noting that "facts are not copyrightable" and may not be owned or licensed). A crop production history is a "simple average of between four and ten years of [] production data." *Ausmus v. Perdue*, 908 F.3d 1248, 1250 (10th Cir. 2018); *see also W. Cent. Packing, Inc. v. Empire Fire & Marine Ins. Co.*, 826 F. Supp. 248, 250 (W.D. Mich. 1993). It is little different from any company's profit/loss history. As historical averages of profit or lack of profit, they cannot be transferred, possessed, or sold, and they do not amount to assets under the Act.

Even if that were not the case, even if this production history somehow could qualify as an asset under the Act, no qualifying transfer occurred anyway. Although complex regulations may govern the use of crop production histories, *Ausmus*, 908 F.3d at 1250–51; *Adkins v. Silverman*, 899 F.3d 395, 399 (5th Cir. 2018); 7 U.S.C. § 1501 *et seq.*; 7 C.F.R. § 400.51–.56, no Boersen entity ever transferred the production history to anyone. The statutory regime requires the crop insurer to supply the congressionally created Federal Crop Insurance Corporation with the insurance applicant's proposed production history for purposes of obtaining crop insurance. 7 U.S.C. § 1501 *et. seq.* While it may be the insured's responsibility to submit evidence to support a claim, it is the insurance provider, not the predecessor entity, that uses the production history. That arrangement means no Boersen-judgment entity ever transferred an asset within

the meaning of the statute because the debtor never delivered the production history.  *See* Mich. Comp. Laws § 566.31(q).

Helena's case citations do not come to grips with the point.  None of them addresses whether the use of a previous landowner's production history qualifies as a transfer of assets. *See Adkins*, 899 F.3d at 399; *Ausmus*, 908 F.3d at 1250; *Bush v. AgSouth Farm Credit, ACA*, 816 S.E.2d 728, 731 (Ga. Ct. App. 2018).  A production history for a farm, like a profit/loss history for a company, might have value to an applicant seeking crop insurance, just as an individual's driving record might have value when it comes to the cost of car insurance.  But these situations still would not call for transfers of assets or property.

How have Stacy and Nick's applications for crop insurance harmed Helena anyway?  The insurance has permitted Stacy and Nick to farm land owned by Boersen-judgment debtors, which puts money into the debtors' pockets and which in turn may help creditors such as Helena.

*Successor Liability*.  Helena separately argues that Stacy and Nick created successor companies to the Boersen-judgment entities.  When someone creates new companies that are the "mere continuity" of debtors, creditors may recover against them under Michigan law (and the law of most States).  *C.T. Charlton & Assocs., Inc. v. Thule, Inc.*, 541 F. App'x 549, 552, 554 (6th Cir. 2013).  But this is a "narrow" theory.  *Id.* at 552.  And Helena must make a threshold showing of "common ownership" to invoke it.  *Id.* at 554; *see also Stramaglia v. United States*, 377 F. App'x 472, 475–76 (6th Cir. 2010) (per curiam); *Turner v. Bituminous Cas. Co.*, 244 N.W.2d 873, 892 (Mich. 1976); *RDM Holdings, LTD v. Cont'l Plastics Co.*, 762 N.W.2d 529, 552 (Mich. Ct. App. 2008); *Lakeview Commons v. Empower Yourself, LLC*, 802 N.W.2d 712, 716 (Mich. Ct. App. 2010) (per curiam); *In re Clements Mfg. Liquidation Co.*, 521 B.R. 231, 256–57 (Bankr. E.D. Mich. 2014).

Helena has not met this burden.  Neither Stacy nor Nick was an owner, manager, or shareholder of any of the Boersen entities covered by the judgment.  And no Boersen legacy owner or guarantor serves as an officer of, or is otherwise employed by, either New Heights company.  "Just having the name 'Boersen' and deciding to farm in West Michigan," as the

district court aptly put it, does not satisfy the "indispensable" common-ownership element. R.163 at 25; *C.T. Charlton & Assocs., Inc.*, 541 F. App'x at 554.

It is true, as Helena points out, that while this lawsuit was pending, Stacy created several Great Lakes Grain entities in a failed effort to obtain credit for the upcoming season. But no evidence exists of fraud. Plus, the creation of the new Great Lakes Grain entities has no bearing on the common ownership between the indebted Boersen entities and the New Heights companies.

Handwritten notes from meetings between the Boersen family and their lenders do not show common ownership either. Not one of the notes contains any evidence of common ownership.

Advertisements about how the Boersen family operation has passed the farm down to Nick also do not satisfy the common-ownership requirement. While Nick has worked on the Boersen farms since the age of 14, that does not show he played an ownership role in the Boersen operation before forming his own company. Nick maintains, to the contrary, that he never held an organizational role in the Boersen debtor entities. Helena offers no contrary evidence. Without more, the debts of the father do not become the debts of the son.

*Veil Piercing.* In a variation on this argument, Helena seeks to recover against the New Heights companies under a veil-piercing theory. Under Michigan law, courts start with the presumption that the corporate form will be respected. *See Seasword v. Hilti, Inc.*, 537 N.W.2d 221, 224 (Mich. 1995); *Wells v. Firestone Tire & Rubber Co.*, 364 N.W.2d 670, 674 (Mich. 1984). To overcome the presumption—to evade the corporate form and to impose liability on the individual owners—three things must happen. The target corporate entity must be a "mere instrumentality" of another entity. The target entity must have been used to commit a wrong. And that wrong must have resulted in loss to the plaintiff. *See Foodland Distribs. v. Al-Naimi*, 559 N.W.2d 379, 381 (Mich. Ct. App. 1996); *see also Florence Cement Co. v. Vettraino*, 807 N.W.2d 917, 922 (Mich. Ct. App. 2011) (per curiam).

On this record, Helena may not ignore the corporate form. *Seasword*, 537 N.W.2d at 224; *Wells*, 364 N.W.2d at 674. Nick and Stacy created their companies on their own. They

respected corporate formalities in doing so.  Neither Dennis Boersen nor any Boersen legacy entity received anything of value from the New Heights companies other than fair market value payments on equipment and land leases.  Dennis does not control either company and is not an owner or officer in either of them.  Mere allegations to the contrary do not alter this conclusion.  Evidence must back the points up.  None does.

Nor was either company used to commit a wrong against Helena.  No evidence shows that these companies failed to follow any statute or regulation in their formation or that they misused the actual production histories assigned to them.

*Foodland Distributors v. Al-Naimi*, 559 N.W.2d 379 (Mich. Ct. App. 1996), is not to the contrary.  In that case, the owner of the legacy company ran the new company, making him indeed the de facto owner.  *Id.* at 381.  Here, by contrast, Stacy and Nick formed and ran their own companies.  So far as the record shows, Dennis never pulled the strings in running the new companies.

We appreciate Helena's anxiety that the formalities of corporate ownership and the informalities of family life present risks.  But courts have respected the corporate form in this area, too.  *See Comm'r of Env't Prot. v. State Five Indus. Park, Inc.*, 37 A.3d 724, 728–30, 734–35, 738–39 (Conn. 2012).  And suspicions about separate ownership by a husband and wife present risks of their own.  We have long since left the time when a woman's property became her husband's upon marriage.  Back then, the two spouses became one under the law, and the one was the husband.  *Burdeno v. Amperse*, 14 Mich. 91, 92 (1866); *see* William E. McCurdy, *Torts Between Persons in Domestic Relation*, 43 Harv. L. Rev. 1030, 1031–32 (1930).  Michigan, like other States, left that era long ago.  *N. Ottawa Cmty. Hosp. v. Kieft*, 578 N.W.2d 267, 269 (Mich. 1998); Mich. Comp. Laws § 557.21; *see United States v. Craft*, 535 U.S. 274, 281 (2002).  A wife is not liable for the debts of her husband, Mich. Comp. Laws § 557.21, and each is allowed to own separate companies.

Also falling short is Helena's effort to look past corporate formalities on the ground that "the record indicates a community of interest."  *See L.A. Walden & Co. v. Consol. Underwriters*, 25 N.W.2d 248, 249 (Mich. 1946); *Kline v. Kline*, 305 N.W.2d 297, 299 (Mich. Ct. App. 1981)

(per curiam); *Scarff Bros. v. Bischer Farms, Inc.*, 386 F. App'x 518, 524 (6th Cir. 2010). Nothing in the record shows a community of interest between the old and the new companies. The new entities, unlike the old entities, were created and are operated by Boersens other than Dennis, his brother, or their parents. No injustice arises from allowing the unencumbered members of a family to move on and to start a new family business, even one that involves the same trade and skill set.

One last point on this score. It remains unclear what Helena means to accomplish with this veil-piercing theory. The conventional idea would be to look through the corporate form of Stacy and Nick's companies to impose individual liability on them. But Helena has no qualm with them and no independent claim to their assets, as they never borrowed money from Helena. That leaves Dennis. But the company already has a judgment against Dennis. And there is no evidence that Dennis has any role in Stacy and Nick's companies. What Helena seems to want is something different—access to Stacy's assets and Nick's too simply because they are related to Dennis. That is not veil piercing. It is making a wife and a child automatically liable for the debts of a husband and father, a principle that neither Michigan law nor any law supports.

III.

*Discovery Requests*. Helena separately argues that the district court erred when it denied a trio of discovery-related motions. We review each claim for an abuse of discretion. *See Perkins v. Am. Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 604 (6th Cir. 2001).

*Request to Modify Discovery Calendar*. The first question is whether the district court abused its discretion when it denied a motion to amend the discovery period. District courts have broad leeway over the discovery process. *See Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 642 (6th Cir. 2018). It takes more than disagreement with a district court's efforts at docket control for an appellate court to reverse. *See Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir. 1989).

No abuse occurred. After Helena learned of Stacy and Nick's creation of the New Heights companies, it requested a third discovery extension. The district court heard oral argument on the motion and doubted whether additional discovery would reap any reward. The

pleadings, in the court's view, offered no indication that more discovery would unearth potentially troublesome asset transfers or otherwise support Helena's claims. The futility of additional discovery prompted the court to deny the motion for an extension. That decision came well within a trial judge's broad discretion.

The district court's failure to analyze the request for additional discovery under Rule 16(b)(4) also does not amount to reversible error. A scheduling order establishing discovery deadlines "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "The primary measure of Rule 16's 'good cause' standard is the moving party's diligence in attempting to meet the case management order's requirements." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002) (quotation omitted). Bound up in the good cause standard is an examination into the potential for prejudice to the non-moving party. *Id.* Even though the district court did not cite Rule 16(b)(4), it satisfied the rule by concluding that even if Helena could prevail on the merits, a victory would beget no practical financial benefit. Proceeds from prior crop years had already been disbursed. To reach future profits, Helena would have to show that Stacy and Nick's allegedly fraudulent insurance applications, which secured those profits, harmed Helena. Helena couldn't do that then, and it can't do that now.

*Rule 56(d) Discovery Motion*. Helena adds that the district court abused its discretion when it denied a motion for additional discovery under Rule 56(d) of the Federal Rules of Civil Procedure. When a party moves for summary judgment, Rule 56(d) allows the "nonmovant [to] show[] by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition," and after that "the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). When reviewing such motions, we consider: (1) when the issue arose; (2) whether the discovery might change the summary judgment ruling; (3) the time for discovery already allowed; (4) any delay in seeking the discovery; and (5) the responsiveness of the other party to prior discovery requests. *Doe v. City of Memphis*, 928 F.3d 481, 491 (6th Cir. 2019).

The district court did not abuse its discretion in denying the motion. Helena had four months of discovery after learning of the New Heights companies. During that time, it failed to

identify any viable theory that could support its claims against Stacy, Nick, and the New Heights companies.  Helena offers no explanation how one of its requests—to obtain Stacy and Nick's applications for crop insurance—would have uncovered material information for its claim.  After sizing up the situation and the history of discovery in the case, the district court determined that additional discovery would not outweigh the "proportionality" concerns implicated by the delay and cost generated by continued discovery.  R.163 at 19 n.11.

The court appropriately considered proportionality in denying the request.  In 2015, Rule 26 of the Federal Rules of Civil Procedure was amended to require that all discovery be "proportional" in nature.  The old rule permitted discovery of any information "reasonably calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1) (2010).  The new rule permits discovery only of information "relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  The change ensures that the parties and courts share the "collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes."  Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment.  The objective was hard to miss.  It was "to improve a system of civil litigation that 'in many cases . . . has become too expensive, time-consuming, and contentious, inhibiting effective access to the courts.'"  *United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*, 839 F.3d 242, 258 (3d Cir. 2016) (quotation omitted).  Instead of facilitating costly and delay-inducing efforts to look under every stone in an e-discovery world populated by many stones, the new rule "crystalizes the concept of reasonable limits on discovery through increased reliance on the common-sense concept of proportionality."  John G. Roberts, Jr., 2015 Year-End Report on the Federal Judiciary 6 (2015).  By "emphasiz[ing] proportionality as the governing principle," the changes "tightened discovery deadlines and so shortened the opportunities for delay."  Neil M. Gorsuch, *A Republic, If You Can Keep It* 260 (2019).  It is now "the power—and *duty*—of the district courts actively to manage discovery and to limit discovery that exceeds its proportional and proper bounds."  *Noble Roman's, Inc. v. Hattenhauer Distrib. Co.*, 314 F.R.D. 304, 306 (S.D. Ind. 2016); *cf. In re State Farm Lloyds*, 520 S.W.3d 595, 614 (Tex. 2017) (the new rule sought "to chang[e] the existing mindset that relevance is enough, restoring proportionality as the collective responsibility of the parties and the court") (quotation omitted).  No abuse of discretion occurred.

*Motion to Compel*.   Last and least, Helena claims that the district court abused its discretion when it denied a motion to compel Stacy and Nick to execute document authorization requests.  *See Pittman*, 901 F.3d at 642.  Parties may demand "any nonprivileged material that is relevant to any party's claim or defense."  Fed. R. Civ. P. 26(b)(1).  But the trial court must limit discovery where the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.  *Id.* 26(b)(1), (2)(C)(iii).

Helena sought to compel Stacy and Nick to authorize the disclosure of information pertaining to crop insurance and the New Heights companies' use of the Boersen legacy entities' actual production history.  But for the reasons already given, that information would not have supported Helena's theories of liability and ample time in discovery had already passed before it made the request.  Here, too, the district court did not abuse its discretion in concluding that "further time and money in discovery . . . would not be proportional to the needs of the case." R.163 at 19 n.11.

We affirm.