RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0095p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

GREGORY ACKERMAN,

*Plaintiff,*

ACKERMAN & SON, LLC, et al.,

*Plaintiffs-Appellants,*

*v.*

UNITED STATES DEPARTMENT OF AGRICULTURE, et al.,
*Defendants-Appellees.*

No. 19-2056

───────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 1:17-cv-11779—Thomas L. Ludington, District Judge.

Argued: October 21, 2020

Decided and Filed: April 28, 2021

Before: GUY, CLAY, and KETHLEDGE, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Mark Granzotto, MARK GRANZOTTO, PC, Berkley, Michigan, for Appellants. Leif Overvold, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellees. **ON BRIEF:** Mark Granzotto, MARK GRANZOTTO, PC, Berkley, Michigan, John D. Tallman, JOHN D. TALLMAN, PLC, Grand Rapids, Michigan, for Appellants. Sarah E. Weiner, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellees. Robert G. Kamenec, Elaine M. Pohl, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Insurance Appellees.

KETHLEDGE, J., delivered the opinion of the court in which GUY, J., joined. CLAY, J. (pp. 10–19), delivered a separate dissenting opinion.

---

**OPINION**

---

KETHLEDGE, Circuit Judge.  To recite the facts in this case is essentially to decide it. The short version is that an agency within the Department of Agriculture summarily approved a proposed plan for dry-bean crop insurance in Michigan based upon the mistaken belief that the terms of the proposed endorsement for the Michigan policy were identical to the terms of the endorsement for a Minnesota policy that the agency had approved the year before.  But the terms of the two endorsements were quite different, because the Michigan endorsement contained a different pricing mechanism—for determining the beans' "harvest price"—than the mechanism the agency had approved as part of the Minnesota endorsement.  That difference later caused significant harm to Michigan farmers who had purchased the coverage, some of whom then brought this suit.  In the district court, the government compounded the agency's mistake when it mistakenly told the district court that the pricing mechanisms in the Michigan and Minnesota endorsements were the same.  Based in part upon that representation, the district court granted summary judgment to the government.  On appeal, the government's brief unhelpfully elides both mistakes rather than acknowledge them; but Plaintiffs' counsel on appeal has made the existence of those mistakes clear enough.  We therefore reverse in part the district court's grant of summary judgment.

I.

A.

1.

For decades, beginning in the 1930s, the Federal Crop Insurance Corporation (FCIC) provided various forms of crop insurance directly to farmers.  Congress expanded the crop-insurance program when it enacted the Federal Crop Insurance Act of 1980 (the Act), which for the first time allowed private actors to offer crop-insurance policies approved by the FCIC.  Those policies include the Common Crop Insurance Policy (Common Policy), whose provisions are codified at 7 C.F.R. § 457.8.  But the Act also allows private actors to propose

new types of crop insurance, which in some instances might "provide a new kind of coverage for a commodity that previously had no available crop insurance." 7 U.S.C. § 1508(h)(3)(A)(ii)(III). These policies typically include an endorsement that modifies various terms of the Common Policy.

To obtain approval for a new kind of crop insurance, a private actor must submit an application to the FCIC. The application—called a 508(h) submission—must include, among other things, a detailed analysis of the new coverage's utility and the text of the proposed policy's terms. *See* 7 C.F.R. § 400.705. The FCIC then forwards the 508(h) submission "to at least five expert reviewers." *Id.* § 400.706(b)(2). Thereafter the submission "shall be approved by the [FCIC]" if, among other things, the proposed policy "adequately protect[s]" farmers' interests. 7 U.S.C. § 1508(h)(3)(A).

Upon approval of a 508(h) submission, the applicant may offer the new coverage or license to other entities the right to offer it. *See* 7 C.F.R. § 400.712(*l*). When the coverage is offered to farmers, the FCIC publishes a "Handbook" for the policy, which "provides the FCIC-approved procedures for administering" the policy. The original applicant may thereafter propose changes to the policy, but the FCIC must review any "significant changes" as a new 508(h) submission. *See id.* § 400.709(a)(2)(ii).

2.

As relevant here, federal crop insurance typically takes one of two forms: yield protection or revenue protection. The narrower form is yield protection, which "only provides protection against a production loss[,]" *i.e.*, a smaller-than-expected harvest. 7 C.F.R. § 457.8. The broader—and more expensive—form is revenue protection, which "provides protection against loss of revenue due to a production loss, price decline or increase, or a combination of both." *Id*. Revenue protection thus protects against losses from production *or* price.

Typically, a farmer is entitled to payment under the price-protection component of a revenue-protection policy when the "harvest price" for the farmer's crop falls short of the "projected price." The harvest price is a measure of the actual market price for a crop during a particular crop year. The FCIC (or the Risk Management Agency (RMA), which oversees the

FCIC within the Department of Agriculture) determines a crop's projected and market price each year, typically by utilizing data from commodities exchanges.    Section 3(c)(5)(ii) of the Common Policy provides that, if data from the exchanges is insufficient for the agency to employ its usual methodology for a particular crop during a particular year, "[r]evenue protection will continue to be available[,]" and "[t]he harvest price will be determined and announced by FCIC"—presumably by making its best estimate based upon its expertise and the available information.

B.

1.

In November 2011, an economic consulting firm, Watts and Associates, filed a lengthy 508(h) submission for a pilot program of revenue insurance for dry beans in Minnesota and North Dakota (the "Minnesota 508(h) submission").    At that time, revenue insurance was unavailable for dry beans because they lacked a commodities exchange that could provide the data necessary to calculate projected and harvest prices.    To remedy that deficiency, Watts suggested using data from sales by farmers directly to bean processors.    Specifically, Watts proposed, the RMA would determine a particular type of bean's projected price for a crop year based upon an average of prices offered by processors for that bean before the planting season; and the RMA would determine the harvest price for that bean based upon market prices reported weekly (September through November) in the Bean Market News, a Department publication. Yet Watts acknowledged that, in the past, even the Bean Market News had occasionally reported little or no data as to those market prices.    In that event, the proposed endorsement would do exactly what the Common Policy did:    provide that the "harvest price will be determined and announced by FCIC[.]"    Watts's proposed Handbook for the policy likewise provided that, in the event of insufficient data from the Bean Market News, the RMA would set the harvest price.

The Board referred Watts's proposal for expert review, which for the most part was positive.    In March 2012, the Board approved the proposal—including provisions in both the endorsement and the Handbook stating that, if data from the Bean Market News proved insufficient to support a determination of a bean's harvest price, the FCIC (or the RMA) would determine that price.

Yet for reasons that are obscure on this record, the policies actually sold to Minnesota and North Dakota bean farmers did not include those same provisions from the approved endorsement and Handbook. Quite the contrary: the endorsement for the policies sold in those states provided that, in the event of insufficient data from the Bean Market News, "*the harvest price will be equal to the projected price*." (Emphasis added.) As a result, the pricing mechanism in these policies would simply default to the projected price—which would make the revenue protection virtually worthless, since for the most part that coverage requires payment to the farmer only when the harvest price falls *below* the projected price.

Meanwhile, in July 2013, Watts applied to have its Minnesota and North Dakota pilot program expanded to Michigan (the "Michigan 508(h) submission"). The Michigan 508(h) submission included a proposed endorsement with the same pricing mechanism (default to the projected price) that had inexplicably made its way into the Minnesota and North Dakota policies. The pricing mechanism was therefore different than the pricing mechanism (the agency determines the harvest price) that the FCIC had actually approved as part of the Minnesota 508(h) submission. Under the agency's own regulations, that difference between approved and proposed pricing mechanisms constituted a "significant change" requiring plenary review by the agency and its experts. *See* 7 C.F.R. § 400.701. Moreover, the proposed Handbook for the Michigan expansion *did* include the pricing mechanism that the FCIC approved as part of the Minnesota 508(h) submission—thereby creating an intra-submission discrepancy in addition to the inter-submission one. Yet the FCIC missed these discrepancies and waved through the proposed expansion on the ground that it amounted to a "non-significant" change.

2.

During the 2015 crop year, Michigan bean farmers bought 1,286 revenue-protection policies pursuant to the expansion of the Watts pilot program. That year brought a bountiful bean harvest, which apparently caused harvest prices to fall well below projected prices— precisely the contingency for which the farmers had bought revenue protection. But that year the Bean Market News published too little data to support a determination of harvest prices. Under those circumstances, the Handbook for the Michigan policies (like the Common Policy) provided that the agency itself would determine the harvest price. But the endorsement for the Michigan

policies provided that, under these circumstances, the harvest price "will be equal to the projected price"; and in the event of a conflict between these documents, the FCIC concluded, the endorsement controlled. The farmers who bought these policies were thus left empty-handed.

3.

Plaintiffs (the "farmers")—all of whom are dry bean farmers in Michigan—thereafter brought this suit against the Department of Agriculture, the FCIC, certain third-party insurers, and Watts itself. The district court dismissed without prejudice the claims against Watts and the insurers, on grounds not relevant here. (The farmers do not challenge either dismissal.) The government then moved for summary judgment on the farmers' claims against the Department of Agriculture and the FCIC. In support of that motion, as mentioned above, the government told the district court that the default pricing mechanisms in the Michigan 508(h) submission and in the "approved" Minnesota 508(h) submission were the same.

That representation was false. The government's brief in support of its summary-judgment motion asserted that the proposed endorsement approved as part of the Minnesota 508(h) submission provided as follows:

> (2) If the harvest price cannot be calculated for the crop year for a type for which a projected price was determined in accordance with section 7 of this endorsement, **the harvest price will be equal to the projected price.**

(Emphasis added by the government.)

But that language—especially the bolded part—was not part of the Minnesota 508(h) submission. Instead, the quoted language came from the endorsement for policies *actually sold* in Minnesota—which, as noted above, inexplicably departed from the endorsement language approved as part of the Minnesota 508(h) submission. The relevant endorsement language actually approved as part of the Minnesota 508(h) submission was as follows:

(2) If the harvest price as defined cannot be calculated for the crop year for a type for which a projected price was determined in accordance with the definition:

(i) A harvest price *will be determined and announced by FCIC* in lieu of the terms contained in the definition of harvest price[.]

(Emphasis added.)

The default pricing mechanisms in the Michigan and Minnesota 508(h) submissions were therefore different—indeed different in a way that proved critical when dry-bean prices fell sharply two years later. Based on the government's mistake, however, the district court assumed that the two pricing mechanisms were the same; and in part for that reason, the district court granted summary judgment in favor of the government. This appeal followed.

II.

We review de novo the district court's grant of summary judgment to the government. *See Ky. Waterways All. v. Johnson*, 540 F.3d 466, 473 (6th Cir. 2008). The farmers' primary argument on appeal is that the FCIC's approval of the Michigan 508(h) submission was "arbitrary, capricious," and done "without observance of procedure required by law[.]" 5 U.S.C. § 706(2)(A), (D).

The premise of that argument is that the Michigan 508(h) submission included a "significant change" from the Minnesota 508(h) submission that the FCIC had approved the year before. The farmers are indisputably correct about that: the agency's own regulation expressly defines "significant change" to include "[a]ny change" in "pricing methodologies[.]" 7 C.F.R. § 400.701. And the Michigan 508(h) submission included a different pricing methodology than the Minnesota one: as recited above, the endorsement included as part of the Michigan 508(h) submission provided that, in the event of inadequate data from the Bean Market News, the "harvest price will be equal to the projected price;" whereas the endorsement in the Minnesota 508(h) submission provided that, in that same event, the "harvest price *will be determined and announced by FCIC*[.]" (Emphasis added.) The Michigan provision thus required the agency to declare the harvest price to be the projected price—thereby rendering the revenue protection in that event essentially worthless, as the FCIC itself acknowledged in a 2016 letter to the Michigan farmers; whereas the Minnesota submission afforded the FCIC discretion to determine a harvest

price of its own.   Yet the FCIC found that the Michigan 508(h) proposal presented only "non-significant changes" to the Minnesota one.

The government responds that the farmers have waived (by which the government means forfeited) any argument that the Michigan 508(h) submission proposed significant changes to the Minnesota one.  That assertion amounts to a claim that the farmers took too long to catch the government's mistake in the district court.  That mistake, by all appearances, was inadvertent; and one might have hoped that the Department of Justice would have confessed error on this point in its brief on appeal.  But instead the government has studiously elided the point, never quoting the relevant text from the Minnesota 508(h) submission or otherwise recognizing any difference between the pricing mechanisms in the Minnesota and Michigan submissions.  *See* Gov't Br. at 10-11, 36-37.  This court has therefore been left to "conduct the equivalent of an archaeological dig" through the record to demonstrate the government's mistake.  *John B. v. Emkes*, 710 F.3d 394, 406 (6th Cir. 2013).  Under these circumstances, suffice it to say, we will exercise our discretion to consider the farmers' argument on the merits.  *See generally Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 658 (6th Cir. 1996).

The merits themselves are straightforward.   As shown above, the agency violated 7 C.F.R. § 400.701 when it found that the Michigan 508(h) proposal presented only "non-significant changes" to the Minnesota one.  (A September 2016 revision to § 400.701 is inapposite here.)   Again the mistake was by all appearances inadvertent: the FCIC appears simply not to have realized that the endorsements in the Michigan and Minnesota 508(h) proposals included different default pricing mechanisms.  That change was plainly "significant," so the agency was required to treat the Michigan submission as "a new 508(h) submission" and to "forward the complete 508(h) submission to at least five expert reviewers[.]"  7 C.F.R. §§ 400.709, 400.706.  The FCIC did neither of those things, so its approval of the Michigan submission was done "without observance of procedure required by law[.]"  5 U.S.C. § 706(2)(D).

The record likewise makes clear that, because of the same mistake, the agency did not adequately consider the impact of the default pricing mechanism in the Michigan 508(h) submission.  Nor did the agency adequately consider whether "the interests of producers [were]

adequately protected" by that submission.  7 U.S.C. § 1508(h)(3)(A)(i).  The agency's approval of the submission was therefore arbitrary and capricious.  *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).

The government responds that the FCIC did consider the risk that the Bean Market News would report insufficient data to support a determination of harvest price in a particular crop year.  But the FCIC was obligated to analyze not only the magnitude of that risk, but also what to do if that risk *materialized*.  The FCIC was therefore required to analyze the Michigan default pricing mechanism directly, in light of the interests spelled out in § 1508(h)(3)(A).  The agency did not do that here.

We therefore reverse the district court's grant of summary judgment in favor of the government on Count II of the farmers' Amended Complaint.  We affirm the court's grant of summary judgment on Count I because the farmers' argument as to that count—that the agency should have interpreted the text of the Michigan default pricing provision to afford the agency discretion to make its own determination of harvest prices—is plainly without merit.

\* \* \*

The district court's July 12, 2019 Order is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

---

**DISSENT**

---

CLAY, Circuit Judge, dissenting. The majority opinion begins with the broad pronouncement that "[t]o recite the facts in this case is essentially to decide it."  Majority Op. at 1.  This introduction foreshadows the majority's focus on the "facts" as it sees them at the expense of any significant legal analysis.  Two related errors are critical to the majority's decision to reverse the district court's grant of summary judgment to the government defendants. First is the failure to accord proper deference to the Federal Crop Insurance Corporation's ("FCIC") determination that the expansion of the dry bean crop insurance pilot to Michigan was a non-significant change.  Second, the reversal is not based on a review of the whole record, but rather is limited to the evidence that supports the majority's conclusion.  I respectfully dissent and would affirm the district court's judgment dismissing Plaintiffs' suit in its entirety.

**I. Background**

The facts in this case are not as straightforward as the majority asserts.  The federal crop insurance program is complex, and Plaintiffs' claims require review of multiple agency decisions under that regime.  *See, e.g.*, *Helena Agri-Enters., LLC v. Great Lakes Grain, LLC*, 988 F.3d 260, 269-70 (6th Cir. 2021) (describing "complex regulations [that] govern the use of crop production histories" by the FCIC).  Moreover, as the majority rightfully emphasizes, the government's filings before the district court were inaccurate on a critical point, which, despite Plaintiffs' raising of the issue, the government did not attempt to address or clarify on appeal, complicating this Court's task.[1]

This case arises out of an effort to make revenue protection insurance available to farmers of dry beans (black, dark red kidney, navy, pinto, and small red beans).  Revenue protection insures farmers against price fluctuations, in addition to providing coverage against production

---

[1]The majority also correctly points out that the September 2016 version of the crop insurance regulations that the government cites on appeal and appended to its brief does not apply in this case challenging agency decisions from 2015 and earlier.  *See Moses v. Providence Hosp. & Med. Ctrs., Inc.*, 561 F.3d 573, 583–84 (6th Cir. 2009) (describing presumption against applying a regulation "to events arising prior to the regulation's enactment").

loss.   There are two types of revenue protection: one simply called "revenue protection" and "revenue protection with harvest price exclusion."  7 C.F.R. § 457.8.  Plaintiffs here purchased the latter type to protect themselves against the risk that the market price for their crops would fall.  Revenue protection of either kind was not previously available for producers of dry beans because there is no futures market for these commodities, which is the traditional source of determining projected and harvest prices, which, in turn, are critical components of calculating the indemnity under a revenue protection policy.

On July 8, 2010, a consulting firm, Watts and Associates, Inc. ("Watts") filed a concept proposal under 7 U.S.C. § 1508(h) with the FCIC to provide revenue protection for dry beans. Watts proposed a pilot program in certain counties in Minnesota and North Dakota that would use data collected by an industry group to determine the projected price.  As for the harvest price, Watts sought to use weekly price data based on actual cash sales of the crops, as reported in the Agricultural Marketing Service's ("AMS") Bean Market News, a government publication.

On August 12, 2010, the FCIC referred Watts' proposal to two experts for review, both of whom agreed the proposal should be submitted to the board of the FCIC ("the Board") for further development.  Both experts recognized the innovation of Watts' submission was its effort to calculate projected and harvest prices in the absence of a futures market for the crops.  One of the expert reviewers, however, specifically asked, "[W]hat would happen to the proposed methodology and insurance program if the AMS stopped providing weekly prices?"  (Admin. R., R. 83-3, Page ID #2624.)  Watts answered the expert's question in its dry bean "Crop Revenue Pilot Program" submission to the FCIC in October 2011, which was revised in November 2011.

That submission, in a section entitled "Rating Methods," described using certain data from the AMS Bean Market News to determine "the harvest price estimate."  (*Id.* at Page ID #2830.)  After concluding that "[t]he timely publishing of prices makes AMS prices useful as a harvest price option," Watts recognized there could be issues with relying on AMS data because "there have been occasions in recent years where AMS has failed to report prices for some types [of dry beans] during the September through November marketing period."  (*Id.*)  Watts further noted that "[i]f AMS prices are to be used as part of the insurance policy, contingency procedures will need to be developed to handle situations where AMS prices are not available."

(*Id.*)  It went on to state that the contingency "[t]he developer recommends [is] that the projected price be substituted for any missing AMS monthly harvest price observations."  (*Id.*)

The November 2011 submission also included a policy document entitled "Dry Bean Crop Provisions," which endorsed a different contingency plan in the event that insufficient AMS Bean Market News data was produced.  That document stated that "[i]f the harvest price as defined cannot be calculated for the crop year . . . [, a] harvest price will be determined and announced by FCIC in lieu of the terms contained in the definition of harvest price . . . ."  (*Id.* at Page ID #2924.)  That same submission also contained a document titled "Dry Bean Revenue Program Insurance Standards Handbook," which endorsed yet another contingency in the event that the AMS Bean Market News failed to publish the data necessary for determining the harvest price.  The handbook stated that "[i]f a harvest price cannot be determined as described by its definition but a projected price was established according to its definition, RMA will establish the harvest price."  (*Id.* at Page ID #2953.)  "RMA" refers to the Risk Management Agency, the agency within the U.S. Department of Agriculture which manages the FCIC.  The FCIC approved Watts' submission for additional expert review on November 17, 2011.

One of the expert reports considered what would happen under Watts' submission if AMS failed to report a harvest price for dry beans.  On this expert's view, the policy of Watts' submission was that "[i]f AMS fails to report a price for September, October, or November, the submitter proposes to substitute the projected price for the missing month when calculating harvest price," that is, the contingency plan described in the "Ratings Method" section of the submission, not in the crop provisions document or handbook.  (*Id.* at Page ID #3176.)  The expert further explained that "[i]n the extreme case where AMS fails to report a price for September, October, and November[,] the harvest price would be equal to the projected price and the revenue insurance product (with or without the harvest price exclusion) would revert to a yield insurance product."  (*Id.*)  The report then described exactly what happened in 2015 in Michigan:  "In this extreme case, insured growers would pay for revenue insurance coverage but would only receive yield insurance coverage."  (*Id.*)  The expert recognized "the need to have a contingency plan for situations when AMS fails to report a price.  However, it seems unfair to

growers who pay for revenue insurance for that contingency plan to effectively shift the policy away from revenue coverage and toward yield coverage." (*Id.*)

Watts presented its submission to the Board on March 1, 2012. In a PowerPoint presentation, Watts included a slide that recognized "AMS has not reported some types in the past" and explained that, in such cases, the harvest price would be determined by "[s]ubstitut[ing] projected price – convert[ing] to yield policy." (*Id.* at Page ID #2670.) In an executive summary also submitted for the Board's consideration on March 1, 2012, Watts addressed a number of issues raised by external reviewers (i.e., experts) and the RMA. (Admin. R., 83-4, Page ID #3376.) Under the heading of "General Concerns," Watts noted, again, "[t]here have been occasions in the past when AMS prices have not been available." (*Id.* at Page ID #3378.) It then, consistent with other materials submitted to the Board, stated: "The submission indicates that if this situation arises in the future, the projected price will be substituted for the harvest price which essentially converts the revenue offer to yield protection with the insured paying the premium for revenue coverage but only getting yield coverage." (*Id.*) On March 1, 2012, the Board, "pursuant to the information" contained in the executive summary and "other material[s] that were submitted to the Board on this matter," approved Watts' dry bean revenue proposal for Minnesota and North Dakota, granting RMA "the authority to make such technical policy changes as are necessary to make the policy legally sufficient." (*Id.* at Page ID #3435.)

The dry bean revenue endorsement that was sold to Minnesota and North Dakota farmers for the 2013 crop year explained that "[i]f the harvest price cannot be calculated for the crop year . . . , the harvest price will be equal to the projected price." (*See id.* at Page ID #3437.) However, the insurance standards handbook for that policy year still stated that "[i]f a harvest price cannot be determined for black beans, dark red kidney beans, navy beans, and pinto beans . . . , RMA will establish the harvest price." (Admin. R., R. 83-3, Page ID #2370.)

In July 2013, Watts submitted a maintenance package to the Board, which sought to expand the dry bean revenue endorsement into Michigan. Watts explained that it was providing "a scaled-back completed 508(h) submission" because "the Dry Bean Revenue Endorsement is currently in service and this package serves to expand the product into Michigan . . . ." (Admin.

R., R. 83-4, Page ID #4110.)   Watts specifically noted that "[m]any of the program materials required are the same as for the existing, approved Dry Bean Revenue Endorsement program. Accordingly, many of the issues related to this expansion package were addressed in the original Pulse Crop Submission to the FCIC Board in 2012." (*Id.*)

Like the previous submission, the 2013 maintenance package stated that "[i]f there is not an adequate amount of data" from the AMS Bean Market News, "then the harvest price will equal the projected price for that type" of dry bean. (*Id.* at Page ID #4216.)   Watts explained that while it "does not anticipate this problem occurring often because we have been assured by AMS that more constant and reliable data will be presented in future years," it was "important to provide a mechanism for determining harvest prices in data-sparse events." (*Id.*)   Watts summarized its proposal as simply an expansion to Michigan using an identical method for calculating projected price and harvest price "to the one in existence . . . ." (*Id.*)

Included in the maintenance package was a copy of the "Dry Bean Revenue Endorsement," which, as relevant here, was identical to what had been sold in Minnesota and North Dakota and provided that "[i]f the harvest price cannot be calculated . . . , the harvest price will be equal to the projected price." (*Id.* at Page ID #4173.)   The insurance standards handbook submitted with the maintenance package still stated that if a harvest price could not be calculated, "RMA will establish the harvest price." (*Id.* at Page ID #4195.)

On August 8, 2013, the Board "determined the requested expansion is non-significant and the submission does not require expert review," approving the revenue protection program in Michigan beginning with the 2014 crop year. (*Id.* at Page ID #4258.)

In 2015, there was a bumper, or unusually productive, bean crop both in the United States and in bean importing countries.   Since there was very little product moving, many entities stopped reporting prices to AMS. As a consequence, there was no harvest price established for dark red kidney beans, navy beans, small red beans, or pinto beans in Michigan in 2015.[2] According to the terms of the Dry Bean Revenue Endorsement that the Michigan farmers had

---

[2]Only navy and small red beans are at issue in this suit.

purchased, the harvest price was set equal to the projected price, effectively meaning that those who had paid additional premiums for revenue protection were left only with yield protection.

## II. Standard of Review

"When a district court upholds on summary judgment an administrative agency's final decision under the Administrative Procedure Act, this court 'review[s] the district court's summary judgment decision de novo, while reviewing the agency's decision under the arbitrary and capricious standard.'" *City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir. 2007) (alteration in original) (*Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 457 (6th Cir. 2004)). We may affirm the grant of summary judgment on any ground supported by the record, even if that differs from the reasoning of the district court. *Thomas v. City of Columbus*, 854 F.3d 361, 364 (6th Cir. 2017).

The FCIC's decision is reviewed under the arbitrary and capricious standard despite the fact that claims, like Plaintiffs', brought under 5 U.S.C. § 706(2)(A), (D) for agency action not taken "in accordance with law" or "without observance of procedure required by law" are generally reviewed *de novo*. *Coal. for Gov't Procurement*, 365 F.3d at 457. Abuse of discretion review is appropriate here because "even in cases arising under § 706(2)(D), our review as a practical matter is often more deferential than that [i.e., *de novo*]. The reason is that the question *whether* a certain procedure is required in a particular circumstance, or whether a certain methodology satisfies the procedure is often left to the agency's discretion." *Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 370 (6th Cir. 2010). This is one of those cases. In *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 375 (1989), the Supreme Court held in administrative review actions under the "in accordance with law" clause of § 706(2)(A) and § 706(2)(D), the question of "significan[ce]" "is a classic example of a factual dispute the resolution of which implicates substantial agency expertise." Accordingly, the Board's determination that the Michigan expansion was a non-significant change from the Minnesota and North Dakota pilot "should not be set aside" unless it was "arbitrary and capricious . . . ." *Id.* at 377.

Under arbitrary and capricious review, "a court is not to substitute its judgment for that of the agency and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009) (cleaned up); *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (same). A decision is arbitrary and capricious if the agency has "entirely failed to consider an important aspect of the problem . . . ." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (citation omitted).

We have also held that "an agency's violation of its procedural rules will not result in reversible error absent a showing that the claimant has been prejudiced on the merits *or deprived of substantial rights because of the agency's procedural lapses*." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) (quoting *Connor v. U.S. Civ. Serv. Comm'n*, 721 F.2d 1054, 1056 (6th Cir. 1983)); *see also Wollschlager v. Fed. Deposit Ins. Corp.*, --- F.3d ---, 2021 WL 1204969, at *5 (6th Cir. Mar. 31, 2021) (recognizing that § 706 requires a reviewing court to take "due account . . . of the rule of prejudicial error").

## III. Discussion

The FCIC's determination that Watts' proposal to expand the revenue insurance pilot to Michigan was a non-significant change was not an abuse of discretion. Accordingly, the determination that additional expert review was not required was "in accordance with law" and in "observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). Similarly, the Board did not fail to consider whether Watts' submission "adequately protected" the interests of farmers. 7 U.S.C. § 1508(h)(3)(A)(i).

The majority errs because of its narrow focus on one part of Watts' 2011 and 2013 submissions, the so-called "endorsement."[3] The majority is correct that the version of the dry bean revenue crop provisions originally proposed for Minnesota and North Dakota stated that "[i]f the harvest price as defined cannot be calculated for the crop year for a type for which a projected price was determined in accordance with the definition . . . [, a] harvest price will be

---

[3]Technically, Watts' original submission included a full policy, which was later condensed to an endorsement to RMA's basic crop insurance provisions.

determined and announced by FCIC in lieu of the terms contained in the definition of harvest price . . . ." (Admin R., R. 83-3, Page ID #2924.) In contrast, the copy of the dry bean revenue endorsement submitted with the maintenance package in support of Watts' request to expand the program to Michigan stated that, under the same circumstances (i.e., when a harvest price could not be calculated under the normal methods), "the harvest price will be equal to the projected price." (Admin. R., R. 83-4, Page ID #4173.)

As the majority also recognizes, Watts' 2011 submission was "lengthy"—nearly 350 pages. Majority Op. at 4. But its analysis focuses only on the proposed "endorsement," which would have had the FCIC set the harvest price in the event that insufficient AMS Bean Market News data was published, and the insurance standards handbook, which provided yet another different contingency method—that the RMA would set the harvest price under the same scenario. This was incorrect. Watts' 2011 submission proposed that if the harvest price could not be determined, the harvest price would be set equal to the projected price, providing neither the FCIC or the RMA any discretion. Under the Administrative Procedure Act ("APA"), "the court shall review the whole record" in determining whether an agency action was "not in accordance with law" or "without observance of procedure required by law . . . ." 5 U.S.C. § 706(2)(A), (D). We have interpreted this provision of the APA as a requirement that "courts 'review the whole record' compiled by the agency when evaluating the lawfulness of an agency decision . . . ." *Klein v. U.S. Dep't of Energy*, 753 F.3d 576, 580 (6th Cir. 2014) (quoting § 706(2)).

The majority's analysis ignores multiple pieces of evidence indicating that when the Board approved the revenue insurance pilot in 2012, the Board was approving a policy under which, if the harvest price could not be calculated, the harvest price would be set equal to the projected price. Watts' 2011 submission declared that "[i]f AMS prices are to be used as part of the insurance policy, contingency procedures will need to be developed to handle situations where AMS prices are not available. The developer recommends that the projected price be substituted for any missing AMS monthly harvest observations." (Admin. R., R. 83-3, Page ID #2830.) While the majority recognizes that Watts' proposal was referred for expert review, it does not discuss how one group of those experts explicitly critiqued what it understood as Watts'

proposal "to substitute the projected price for the missing month when calculating harvest price" in the event of insufficient AMS data. (*Id.* at Page ID #3176.)

Not only did the Board know that substituting the projected price for the harvest price was Watts' contingency plan, but the Board also knew the potential consequences of that proposal—that farmers' revenue protection could be converted to yield protection. The same expert report stated that "it seems unfair to growers who pay for revenue insurance for that contingency plan to effectively shift the policy away from revenue coverage and toward yield coverage." (*Id.*) There is also no mention in the majority opinion of Watts' submission of materials to the Board recognizing concerns about AMS price data availability and responding that "if this situation arises in the future, the projected price will be substituted for the harvest price which essentially converts the revenue offer to yield protection with the insured paying the premium for revenue coverage but only getting yield coverage." (Admin. R., R. 83-4, Page ID #3378.) The majority also ignores the PowerPoint presentation that Watts prepared for the Board in February 2012, which explained that, if AMS failed to report sufficient data, Watts' revenue protection would essentially be converted into a yield policy.

Given these multiple submissions by Watts and the understanding of experts, particularly in light of the deference owed an agency determination in this context, I would defer to the Board's determination that the 2013 expansion of the revenue protection program for dry beans was a non-significant change. The policy considered and approved by the Board in March 2012 for the Minnesota and North Dakota pilot sought to substitute the projected price for the harvest price in the event that AMS did not publish sufficient data. Accordingly, the Board was not required to treat the Michigan expansion as a new submission, with all that entails, including referral to five independent experts. *See* 7 C.F.R. § 400.709(a)(2)(ii) (2012) ("Significant changes must be submitted to the Board for review in accordance with this subpart and will be considered as a new submission[.]").

## IV. Conclusion

Under arbitrary and capricious review, "our role is limited to reviewing the administrative record 'to determine whether there exists a rational connection between the facts

found and the choice made.'" *Nat'l Truck Equip. v. Nat'l Highway Traffic Safety Admin.*, 711 F.3d 662, 667 (6th Cir. 2013) (quoting *Alliance for Cmty. Media v. F.C.C.*, 529 F.3d 763, 786 (6th Cir. 2008)). "The facts found, of course, must be supported by substantial evidence in the record as a whole." *Id.* Deference when reviewing agency action means the question presented here is whether there was sufficient evidence in the record to support the agency's determination that the Michigan expansion was a non-significant change that did not require reconsideration as a new submission, not whether there is evidence in the record to the contrary. *See id.* at 669. The majority mistakenly asks and answers the second question. I dissent.